# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

BARBARA STERN GOLD,

           Plaintiff,

v.

GARY GENSLER, Chairman
Commodity Futures Trading Commission,

           Defendant.

Civil Action No. 09-cv-02125 (RLW)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After considering the undisputed facts, as well as the testimony of the witnesses, the exhibits, and the arguments of the parties, the Court makes the following findings of fact and conclusions of law.

### BACKGROUND

Plaintiff Barbara Stern Gold ("Gold" or "Plaintiff") alleges that she was discriminated against in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, when she was not selected for the position of Deputy Director, Compliance and Registration, Division of Clearing and Intermediary Oversight at the Commodity Futures Trading Commission, on February 20, 2008.

**FINDINGS OF FACT**

Based on a review of the evidence presented at trial in December 2011, and after considering the testimony of the witnesses, the exhibits, and the arguments of the parties, the Court makes the following findings of fact and conclusions of law. Consistent with these findings and conclusions the Court will enter judgment in favor of defendant.

1. In 2008, Plaintiff Barbara Stern Gold was employed as an Associate Director with the Commodity Futures Trading Commission ("CFTC"), in the Division of Clearing and Intermediary Oversight ("DCIO"). She brought this action claiming that the selection of William Penner, who was seventeen years younger than Gold at the time, for the position of DCIO Deputy Director (for which plaintiff had applied) violated the ADEA. This selection occurred on February 20, 2008.

2. The DCIO is a program office that reports to the CFTC. During the relevant time period (2007 - 2008), the Director of the DCIO was Ananda Radhakrishnan. Radhakrishnan's direct reports during this time were his special counsel, Natalie Markman, and his three Deputy Directors, Thomas Smith, John Lawton, and Larry Patent.

3. In 2007, Patent was the head of the Compliance and Registration ("C&R") Section of DCIO. Gold was his Associate Director.

4. On November 8, 2007, Patent announced his intention to retire on January 4, 2008.

5. On December 10, 2007, Patent submitted his "Letter to My Successor" to Radhakrishnan. The letter highlighted certain items that Patent felt his successor should be cognizant of at the beginning of his or her tenure as a Deputy Director. Among other things, Patent's letter detailed the areas of expertise of the professional

2

staff in the C&R Section. Regarding Gold, Patent noted that "[a]lthough Barbara's principal concentration has been in the managed money area, I have every confidence that she can handle any aspect of the activities of the Compliance and Registration Section, whether programmatic or administrative."

6. Patent retired from the CFTC on January 3, 2008. Radhakrishnan was not required to immediately fill the vacancy with an Acting Deputy Director, as he could have assumed the duties of the Deputy Director himself. Nonetheless, Radhakrishnan decided to appoint Gold to the position of Acting Deputy Director of the C&R Section. Gold held this position from January 4, 2008 to March 30, 2008. As Acting Deputy Director, Gold reported directly to Radhakrishnan.

*The Candidate Search*

7. Shortly after learning of Patent's upcoming retirement, Radhakrishnan reached out to potential candidates outside of DCIO to fill the position. Radhakrishnan contacted Phyllis Cela, Chief Counsel, Division of Enforcement within the CFTC. Cela told Radhakrishnan that she was not interested in the Deputy Director position, but suggested to Radhakrishnan that William Penner, a former CFTC employee who had worked for Cela previously and whom she regarded highly, would be an excellent candidate for the position.

8. Radhakrishnan also contacted Paul Architzel, a former CFTC employee, about the position.

9. On November 14, 2007, Cela contacted Penner and informed him that she had told Radhakrishnan that he could be interested in the Deputy Director position. She also

3

gave Radhakrishnan's contact information to Penner and urged him to call Radhakrishnan the next day.

10. On November 15, 2007, Penner called Radhakrishnan and discussed the details of the upcoming Deputy Director vacancy and his qualifications for the position. Penner also sent his resume to Radhakrishnan via email on the same day. Penner also had contact with Markman during November of 2007.

11. Radhakrishnan made several false or contradictory statements under oath concerning his contact with Penner prior to the issuance of the vacancy announcement, including that he did not know or could not recall how Penner learned of the vacancy and whether he had any contact with Penner prior to Penner's formal interview in February 2008. However, it is clear from contemporaneous emails between Penner, Cela, and Radhakrishnan that Penner learned about the vacancy from Cela and that Penner had substantive contact with Radhakrishnan at least a month before the vacancy was posted.

12. On December 14, 2007, the CFTC issued the vacancy announcement for the Deputy Director position, with applications to be submitted by January 14, 2008. The announcement required an applicant to have a law degree and "[a]t least one year of [high level legal] experience . . . at a level of responsibility and difficulty equivalent to that of positions at the next lower grade level in the Federal service (e.g., CT-15 or GS-15) and clearly demonstrate the knowledge, skill, and ability to perform the duties of this position." The announcement listed four criteria on which the applicants were to be evaluated: leadership (with six sub-criteria); substantive knowledge (with three sub-criteria); strategic analytical skills (with three sub-criteria); and communication (with

five sub-criteria). The announcement further stated that for a candidate's application to receive "full consideration," the application must address each of the criteria in a separate statement attached to and supplementing their resume.

13. On January 8, 2008, Penner submitted his application consisting of a cover letter and resume. Penner did not specifically address the knowledge, skill and abilities requirement ("KSAs") as required by the job announcement. Nor did his application provide references.

14. Penner testified that the Deputy Director position at the CFTC was the only job he applied for between November 2007 and February 2008.

15. Another applicant, Gretchen Lowe, Associate Chief Counsel, Division of Enforcement, submitted an application packet similar to Penner's. She did not specifically address the KSAs or provide references. Her two-page application consisted of a cover letter and resume. Gold submitted an application consisting of a three-page cover letter, a nine-page statement addressing each of the KSAs and sub-criteria, two letters of recommendation, and her resume.

16. A rating panel was convened to screen the applications. The Office of Human Resources and Radhakrishnan selected Cela, Lawton, and Smith to serve on the review panel because they were considered subject matter experts. The panel reviewed the applications and put each candidate in one of four categories: "Best Qualified," "Well Qualified," "Qualified," and "Minimally Qualified."

17. Although the rating panel was instructed to rate each applicant based on the written application they submitted—and not upon any personal knowledge that a panel member may have about a particular applicant—Cela testified that personal knowledge

about the applicants was discussed during the rating process. In particular, Smith shared his personal knowledge of Gold's work and abilities; Cela shared the same personal knowledge regarding Penner.

18. The rating panel rated Gold and Lowe as "Best Qualified." The panel rated Penner as "Well Qualified," noting that Penner was not as experienced in the management category as the applicants placed in the "Best Qualified" category. Thus, while Gold was deemed to be in the "Best Qualified" category by the rating panel, Penner was ranked just one level below as "Well Qualified." Ultimately, the review panel rated five applicants as "Best Qualified" and two applicants as "Well Qualified."

19. Radhakrishnan decided to interview the seven applicants that were either "Best Qualified" or "Well Qualified." He asked Lawton, Smith, and Markman to participate in the seven interviews that were held on February 4 and 5, 2008. Gold was interviewed on February 4, 2008; Penner and Lowe were interviewed on February 5, 2008. During the interview process, Radhakrishnan focused on three criteria to evaluate the candidates: breadth of knowledge, management philosophy, and management skills.

20. At the end of the interviews, Radhakrishnan held a brief meeting to ask all the interviewers to recommend their top three candidates. Every member of the interview panel ranked Lowe and Penner as one of the top three candidates at the end of the process. However, Gold was not one of the top three candidates by every member of the panel, as Markman did not rank Gold among her top three candidates. Lawton ranked Lowe first, Gold second, and Penner third. Smith ranked Gold first, Lowe

second, and Penner third. Markman ranked Penner first, Lowe second, and Architzel third.

21. After consulting with the interview panel, Radhakrishnan initially selected Lowe as his first choice and Penner as his second choice.

22. On February 11, 2008, Radhakrishnan informed Mr. Loesch, Chief of Staff to Acting Chairman Lukken, that Lowe was his first choice to fill the Deputy Director Position. However, after learning that Loesch and Lukken may have had reservations about Lowe's management abilities, Radhakrishnan decided to recommend his second choice, Penner, to Loesch. No reservations were expressed regarding Penner by either Loesch or Lukken, and Penner was selected for the position on February 20, 2008. An offer was extended to Penner on February 27, 2008, and he became the Deputy Director of the C&R Section of DCIO on March 31, 2008.

### ***Penner and Gold's Qualifications***

####    a.     **Breadth of Knowledge**

23. Penner's previous work experience at the CFTC gave him broad exposure to subject areas across the entire Commission. From December 2002 to September 2005 he worked for Ms. Cela as Assistant Chief Counsel in the Division of Enforcement. He also worked as a staff attorney in the same office from 1996 to 1999. In both positions in the Division of Enforcement, Penner provided legal and policy assistance to the Chief Counsel and Director of the Division of Enforcement. Among his many responsibilities in these roles, he served as a division liaison with other divisions and offices within the Commission. From November 1999 to November 2002 he was legal counsel to Commissioner Thomas Erickson. In addition to providing counsel to

7

Commissioner Erickson on policy and legal implication of various matters, Penner also served as a liaison with industry organizations, the media, and congressional offices. Penner also served as Legal Assistant to Acting Chairman David Spears from June 1999 to August 1999. In that role he advised the Acting Chairman on legal matters including staff recommendations on enforcement and adjudicatory matters and regulatory proposals.

24. In contrast, Gold's previous work experience at the CFTC gave her a highly technical, but more narrow, breadth of knowledge related primarily to the activities of the Compliance and Registration Section and the DCIO division. Gold has had direct employment experience in each of the three program areas for which DCIO is responsible. During her time at the CFTC Gold has generally worked in the area of compliance and registration regulatory issues related to financial intermediaries, market professionals, and the National Futures Association. She is acknowledged as an expert on registration matters generally with a specific concentration on commodity pool operator and commodity trading advisor matters. In addition, Gold's participation in various rulemakings necessitated directing and coordinating activities within numerous sections of DCIO.

25. Radhakrishnan testified that he believed that Penner's breadth of knowledge was superior to Gold's because he did not want a technician for the position. He wanted someone with a broad base of knowledge, rather than someone with a deep understanding in one or more areas. In addition, like Penner, Radhakrishnan previously served as legal counsel to Commissioners in the CFTC. In fact, Radhakrishnan was legal counsel to four Chairmen of the Commission. This shared

experience gave Radhakrishnan a specific insight as to Penner's previous experience in at the Commission.

### b. Management Philosophy and Skill

26. Radhakrishnan questioned each of the candidates about their management philosophy during their interviews. Based on Radhakrishnan's interview notes, Penner and Gold's responses were essentially the same. Both applicants favored an individualized approach with a focus on maximizing the potential of their direct reports.

27. Radhakrishnan assessed Penner's management skill based on Penner's work experience at FastSigns. Radhakrishnan relied on the information provided in Penner's resume and by Penner himself in the interview. According to Penner, he had an ownership share in the FastSigns business and his responsibilities included managing production, installations and "back office" operations. He also supervised three to four employees. The store broke a sales record for first-year receipts by a new franchise. Radhakrishnan did not corroborate any of Penner's assertions about his management experience or performance at FastSigns.

28. Radhakrishnan was also able to evaluate Gold's management philosophy and management skill first-hand while Gold was an Associate Director and Acting Deputy Director of Compliance and Registration. Radhakrishnan testified that he had doubts about Gold's management abilities for two reasons. First, he found that Gold had an "intimidating" communication style. Second, he was also aware of an incident where Gold threatened to fire employees who did not work their required hours. When

Radhakrishnan evaluated Gold on her performance as Acting Deputy Director, he rated Gold a 3 out of a possible 5 on elements related to management ability. This corroborates Radhakrishnan's assertion that he had concerns about Gold's management ability.

## CONCLUSIONS OF LAW

## ANALYSIS

### I. The Legal Standard for ADEA

The federal-sector provision of the ADEA provides that: "All personnel actions affecting employees . . . who are at least 40 years of age . . . shall be made free from any discrimination based on age." 29 U.S.C. § 633(a). To establish liability, the issues are: (1) whether plaintiff has demonstrated discrimination because of age by a preponderance of the evidence; and (2) whether "but for" plaintiff's age, she would have been awarded the promotion she sought. Hayman v. National Academy of Sciences, 23 F.3d 535, 538 (D.C. Cir. 1994). Alternatively, the plaintiff can proceed by establishing that it is more likely than not that age was a "motivating factor" in the decision not to promote her and to choose another applicant. Ford v. Mabus, 629 F.3d 198, 207 (D.C. Cir. 2010). The Court finds that plaintiff has failed to meet her burden of proof on either theory.

### II. Analysis

In order to prove a disparate treatment claim under the ADEA, a plaintiff must first prove by a preponderance of the evidence a prima facie case of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 803 (1973). A plaintiff may establish a prima facie case by showing that: (1) she was a member of the statutorily protected age group (over the age of forty); she applied for and was qualified for the position sought; (3) she was not hired despite her

qualifications; and (4) she was rejected in favor of a younger applicant. Kroger v. Reno, 98 F.3d 631, 633 (D.C. Cir. 1996). Once a plaintiff has established a prima facie case of age discrimination, the defendant "bears the burden of producing a non-discriminatory explanation for the challenged personnel action." Ford v. Mabus, 629 F.3d 198, 201 (D.C. Cir. 2010) (citing McDonnell Douglas, 411 U.S. at 802-03). After the defendant has produced a legitimate, non-discriminatory reason for the action, plaintiff bears the burden of showing either that "the employer's reason is pretextual or . . . that it was more likely than not that the employer was motivated by discrimination." Id. (citing Forman v. Small, 271 F.3d 285, 292 (D.C. Cir. 2001)). Although the intermediate evidentiary burdens shift back and forth under the McDonnell Douglas framework, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).

The Court denied Defendant's Motion for Summary Judgment with respect to Plaintiff's ADEA claim. Specifically, the Court concluded that there was a genuine issue of disputed fact as to whether Penner was more qualified than Gold in terms of breadth of knowledge. Further, because one of the other criteria applied—management philosophy—is highly subjective, a decision based upon this reason is subject to heightened scrutiny for potential pretext, particularly if a factfinder could find that Gold was significantly more qualified than Penner. In addition, Radhakrishnan and Penner's credibility related to important issues surrounding the hiring decision was severely weakened by several false or contradictory statements made under oath. This further suggested that the proffered reason for Penner's selection could have been pretextual. Also, the fact that the final two candidates were much younger than Plaintiff

suggested that age could have been a basis for Radhakrishnan's decision.  Ultimately, the Court concluded that there was sufficient evidence to allow the case to proceed to trial.

At trial, however, Plaintiff failed to establish that age was either a determining or motivating factor in the selection decision.  Therefore, after having the opportunity to view all the evidence, hear all the testimony, assess the credibility of the witnesses, and to test Plaintiff's assertions, the Court finds for the Defendant on Plaintiff's claim of age discrimination under the ADEA.

### A. Plaintiff's Contentions

Plaintiff's central contentions in support of her ADEA claim are: (1) Radhakrishnan's stated reason for selecting Penner over Gold is a pretext because Penner did not meet the criteria that Radhakrishnan stated as being determinative; (2) the fact that Radhakrishnan changed his stated criteria for evaluating the candidates suggests that his reasons for the selection are false; (3) at least one of the criteria used by Radhakrishnan to make his selection decision is highly subjective, and thus subject to heightened scrutiny; (4) Radhakrishnan's interview notes which indicate that Penner brings "fresh perspective and new energy" evidences a discriminatory motive in Radhakrishnan's selection decision; (5) Radhakrishnan's honest belief that Penner was more qualified than Gold is not entitled to deference because his credibility has been undermined throughout the trial; (6) the fact that Gold is significantly more qualified than Penner raises an inference of discrimination; and (7) because the selection process was tainted by irregularities, including violations of merit system principles, discrimination can be inferred.  The Court will address each of these contentions in turn.

## B. Penner Meets Radhakrishnan's Stated Criteria

Radhakrishnan testified that he used three criteria to evaluate the candidates: (1) breadth of knowledge; (2) management philosophy; and (3) management skills. The Court finds Radhakrishnan's testimony credible that he believed Penner was superior based on the breadth of knowledge criterion. Penner—while his CFTC tenure was shorter than Gold's—had broader experience than Gold relating to the overall workings of the CFTC due to his experience in the Division of Enforcement, which allowed him to observe and interact with not just one division, but with all the divisions within the commission. Penner worked as an attorney advisor for two commissioners within the CFTC. He also spent six years in the chief counsel's office within the Division of Enforcement. These positions, particularly the position in the chief counsel's office, placed Penner in a unique position to have a window to the entire agency. This window gave Penner the breadth of knowledge that Radhakrishnan valued in making his hiring decision. If Radhakrishnan wanted to focus on this aspect of Penner's background in making his hiring decision, that is a business decision that Radhakrishnan, as the selecting official, is entitled to make. The Court is not inclined to second-guess how an employer weighs particular factors in a hiring decision. See Barnette v. Chertoff, 453 F.3d 513, 517 (D.C. Cir. 2006) ("[C]ourts must defer to the employer's decision as to which qualities required by the job . . . it weighs more heavily.").

Management skills and management philosophy are also proper criteria to consider in a hiring decision and are consistent with a legitimate business decision. With respect to management philosophy, the best that Plaintiff can argue was that Penner's answer was the same as her own. However, this fact alone does not prove pretext because it does not establish that Gold's answer was significantly better than Penner's.

Regarding management skill, Radhakrishnan evaluated Penner's management skill based on Penner's self-description of his management experience and abilities. Radhakrishnan did not seek to corroborate Penner's assertions about his work at FastSigns. Additionally, Radhakrishnan lied or was less than credible when he asserted that he checked Penner's references, as it is undisputed that there is no evidence that Radhakrishnan checked any references for Penner.[1] Notwithstanding Radhakrishnan's failure to check Penner's references or corroborate Penner's assertions, it was reasonable for Radhakrishnan to conclude that Penner had sufficient or even superior management skill. It is undisputed that Radhakrishnan believed that Gold had management issues. Also, Radhakrishnan had the opportunity to observe Gold's management style and management skill while she was in the position of Acting Deputy Director. The Court credits Radhakrishnan's testimony that he observed, either directly or through others, aspects of Gold's management style that caused him to have doubts about promoting Gold to the Deputy Director Position.

Ultimately, the Court credits Radhakrishnan's testimony that he found that Penner had equal or better breadth of knowledge, management philosophy, and management skill than Gold.

### C. Radhakrishnan Applied the Same Criteria Throughout the Hiring Process

During the EEO investigation, Radhakrishnan testified in his affidavit that he believed Penner was superior to Gold based on the seventeen evaluation criteria listed in the vacancy

---

[1] Relying on the decision in Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 12975 (D.C. Cir. 1998) (en banc), Plaintiff argues that Radhakrishnan's failure to verify Penner's references and qualifications can give rise to an inference of discrimination. Aka is inapposite. In Aka, the D.C. Circuit explained that evidence that an employer has *misstated* candidates' qualifications "may suffice to permit a jury to infer that the employer's explanation is incorrect or fabricated, and thus to infer discrimination." Id. Here, Radhakrishnan did not deliberately misstate Penner's qualifications, instead he simply took Penner at his word.

announcement. However, during trial, Radhakrishnan testified that he based his selection decision on the three determinative criteria previously discussed. Plaintiff argues that these "shifting grounds" for his selection decision are further evidence of pretext.

The Court does not agree. It is clear from Radhakrishnan's interview notes that he evaluated each candidate based on his three broader selection criteria, rather than the seventeen subcategories listed in the vacancy announcement. Radhakrishnan testified that the EEO affidavit was drafted by and based upon the questions posed by the EEO investigator. Thus, the Court credits Radhakrishnan's testimony at trial regarding the three determinative criteria on which he based his decision. The Court does not find it appropriate to limit Radhakrishnan's evaluation to the criteria in the vacancy announcement because reasonable employers "do not ordinarily limit their evaluation of applicants to a mechanistic checkoff of qualifications required by the written job descriptions." Jackson v. Gonzales, 496 F.3d 703, 709 (D.C. Cir. 2007) (quoting Aka, 156 F.3d at 1297 n. 15); see also Browning v. Dep't of the Army, 436 F.3d 692, 696-97 (6th Cir. 2006) ("employers are not rigidly bound by the language in a job description"; employer's "decision to weigh administrative/managerial experience more heavily than the job description suggested [was] simply not sufficient to demonstrate" falsity of employer's qualifications-based explanation). The fact that Radhakrishnan based his hiring decision on three factors that encompassed the broader set of criteria in the general job description does not in itself raise an inference of discrimination or pretext.

### D. The Criteria Applied by Radhakrishnan Were Subjective, but Valid

Radhakrishnan's evaluation based on management philosophy is entirely subjective, and is therefore subject to heightened scrutiny. See Aka, 156 F.3d at 1298. This circuit has observed that an employer's heavy reliance on "highly subjective" criteria could support an inference of

discrimination. Fischbach v. D.C. Department of Corrections, 86 F.3d 1180, 1184 (D.C. Cir. 1996).

The Court has examined Radhakrishnan's subjective assessments of Gold and Penner with heightened scrutiny and does not find Radhakrishnan's criterion improper. Radhakrishnan's interview notes indicate that Gold and Penner gave similar responses when questioned about their management philosophies. However, the Court notes that Radhakrishnan had the opportunity to see Gold's management style and management philosophy in action while she was in the Acting Deputy Director position. After assessing Radhakrishnan's credibility on this point, the Court concludes that Radhakrishnan's testimony that he thought that Gold's management philosophy conflicted with his philosophy, and that Penner's management philosophy was more in line with his own, should be credited.

### E. Radhakrishnan's Interview Notes Do Not Suggest Ageist Animus

Plaintiff argues that Radhakrishnan's interview notes stating that Penner brought "fresh perspective and new energy" to the job is an inherently ageist comment that gives rise to an inference of discrimination. The Court disagrees. First, this argument borders on frivolous, as Radhakrishnan has testified that he was merely recording Penner's responses, and the Court agrees. Therefore, the statement cannot fairly be attributed to Radhakrishnan's state of mind during the interview with Penner. Second, even if these were Radhakrishnan's own words, the Court finds nothing inherently ageist about the comment.[2] See Threadgill v. Spellings, 435

---

[2] Plaintiff also argues that Radhakrishnan's statement that "a person had to start somewhere" when questioned about Penner's management experience suggests an ageist animus. For the same reasons as stated above, the Court finds nothing in this statement that suggests discriminatory motive.

F.Supp.2d 126, 140 (D.D.C. 2006) (finding nothing discriminatory about a manager indicating that he may need to bring "new blood" to a team).

### F. Radhakrishnan's Credibility

The Court has taken due regard that there were numerous issues with certain aspects of Radhakrishnan and Penner's credibility. However, overall, the Court finds that both men's primary motive to fabricate was a desire to hide the appearance of impropriety, from having substantive communications prior to the vacancy announcement. As discussed more fully below, this does not establish age discrimination.

### G. Gold's Qualifications

In her years working for the Commission, Gold has acquired technical knowledge in all aspects of Compliance and Registration. Indeed, she has been acknowledged as an expert in the managed funds area. Gold also performed the duties of a Deputy Director during her time as Acting Deputy Director. In addition, Gold had management experience as an Associate Director that supervised staff attorneys who dealt with Forex, money laundering, and Part 30 petitions. Gold is clearly very knowledgeable with respect to the technical elements of work done within the Compliance and Registration Section of DCIO.

Nonetheless, the fact that Gold has superior knowledge of Compliance and Registration matters is not evidence of such a disparity in qualifications to give rise to an inference of discrimination. Even if one were to compare Gold and Penner based solely on the competencies set forth in the vacancy announcement, there is no significant disparity between their qualifications. The rating panel did this very analysis and concluded that Gold was "Best Qualified" and Penner was just one notch below at "Well Qualified."

Ultimately, Radhakrishnan used his own criteria to make his selection decision. He concluded that Penner's management style was in accord with his own. Radhakrishnan also credited Penner's assertions about his management experience. And finally, Radhakrishnan concluded that Penner had a greater breadth of knowledge than Gold. When viewed in this context, this is not a case where there is such a large disparity in qualifications to infer discrimination.

### H. The Selection Process

Based on the evidence in the record, it is clear that there was a substantive conversation between Penner and Radhakrishnan on November 15, 2007. This was a substantive conversation because both the details of the upcoming vacancy and Penner's qualifications for the position were discussed. The Court cannot credit Penner's testimony that he cannot remember the substance of this conversation. This was a conversation with the selecting official for the only job that Penner applied for, so it is highly doubtful that Penner would forget an event of such significance. The fact that Radhakrishnan could not remember his conversation with Penner at all at either his deposition or when drafting his affidavit in response to the EEO investigation—but could recollect some of the substance of the conversation when questioned by the Court at trial—makes his testimony regarding this event even less credible.

Notwithstanding these credibility issues, the Court concludes that the selection process was not so tainted with irregularities to give rise to an inference of age discrimination. Penner and Radhakrishnan's memory lapses and conflicting testimony indicate that they were trying to conceal their early substantive conversations about the upcoming vacancy in the deputy director position. However, the fact that they had these conversations does not establish pre-selection or ageist animus. Nor does it suggest pretext. Ultimately, it appears that both men were trying to

18

mask their early conversations because either it might reflect poorly on Radhakrishnan or show a violation of merit system principles.

Although Penner and Radhakrishnan's early contact may have been a violation of merit selection principles, it was not pre-selection, and it does not create an inference of age discrimination—at most, it establishes that Radhakrishnan gave Penner favorable treatment because he was well regarded by Cela and Markman. It is undisputed that Radhakrishnan sent two names to the chief of staff of the CFTC Chairman—Lowe and Penner. If Penner had been pre-selected, Radhakrishnan would not have sent both names to the chief of staff, as the feedback could have favored Lowe, inhibiting his selection of Penner. Thus, the Court does not credit that there was actual pre-selection of Penner.

Additionally, it appears that both Gold and Penner benefitted from irregularities in the selection process. Although the rating panel members were instructed to rate each applicant on the written application they submitted, and not upon any personal knowledge, members of the rating panel discussed personal knowledge of both Gold and Penner during the evaluation process. Similarly, while Penner may have been the beneficiary of Cela's favorable recommendation, Gold received a similar endorsement from Larry Patent in his letter to his successor. Further, Radhakrishnan put Gold in the Acting Deputy Director position upon Patent's departure, which arguably put Gold on the inside track for promotion to the permanent position.[3]

---

[3] The Court also notes that this fact cuts against a finding of discriminatory intent or ageist animus, because Radhakrishnan appointed Gold to the Acting Deputy Director position, even though he was not required to fill the position.

In sum, the Court finds that the Plaintiff has not proven pretext by a preponderance of the evidence. Finding no pretext, there is insufficient evidence of intent to discriminate under either the "but for" or the "mixed motive" tests. Thus, the Court finds for the defendant.

### III. Damages

Because plaintiff has not established by a preponderance of the evidence that plaintiff would have been selected for promotion "but for" the unlawful consideration of age, plaintiff is not entitled to instatement to the successor position, back pay and benefits, or other compensatory relief. Plaintiff has also failed to establish liability by showing that age was *a motivating* factor in the promotion decision. Therefore, plaintiff is not entitled to declaratory or injunctive relief under a "mixed-motive" theory.

## CONCLUSION

Plaintiff has not established that Defendant is liable for age discrimination. Accordingly, the Court finds in favor of Defendant.

A judgment consistent with these findings shall issue this date.

SO ORDERED.

Date: January 5, 2012

ROBERT L. WILKINS
United States District Judge